Pellant, please identify yourself and how much time you need. Good morning. My name is Grace Palacio from the Office of the State Appellate Defender. I would ask for about 10 minutes and five for rebuttal if necessary. Thank you. Good morning. Andrea V. Salone on behalf of the people. And how long do you need? About 15 to 20 minutes. Okay. Thank you. Good morning. May it please the court, my name is Grace Palacio and I represent the defendant Jesus Alicea. Alicea was convicted of unlawful use of a weapon by a felon for guns that were recovered during the search of a bedroom of an apartment. The question before the court today is whether the state proved that Alicea had constructive possession of these guns. The state did not prove that Alicea had knowledge or control of the guns, where one, he did not live in the apartment and was not present at the time of the search, and two, others had access to the bedroom where the guns were hidden. Because the state failed to prove that Alicea had knowledge or control of the guns, this court should reverse its convictions. As noted, the state failed to prove that Alicea had knowledge of the guns or control over the area where they were found. First, he was not in the apartment at the time of the search. He did not live there. You can't prove that he had knowledge of anything that was in the apartment. Second, there were other people in the house who had access to this room and possibly these guns and ammunition. There's no dispute that when the officers came to the house that Christopher Blanchard was there, and he said that he had been staying there. Anais Alicea testified that she lived there with her young child, that Christopher lived there, and that her other brother, Michael, lived there. So clearly there are other people who could have had access to these guns. It just simply cannot make the inference that because Alicea may have lived there at one time, that he had knowledge and control of these guns, especially where these guns were not in plain view. They were hidden. They were under a mattress. They were hidden under clothes. The state's only evidence against Alicea was the fact that his driver's license had this address, a place where he used to live, and a check that was hidden, that was put away in the drawer, not even where the guns were found. It was in a different place, in a different area of the bedroom, where the guns were found under a mattress and under hidden clothing. Well, the testimony was from Anais and Ms. Morales that Mr. Alicea had moved out on a frequent basis sometime in 2009, and then he was living full-time with Ms. Morales starting in January 2010. Why is it that we're seeing a U.S. Treasury check in the drawer the day before the arrest, dated the day before the search warrant was executed, and a driver's license issued two months prior to that time with the Knox address on it? Well, Anais testified that she was still receiving the checks at the house, and then she would have her father endorse it, and then she would deposit it. She also explained that they had a business together, so while this was no longer his residence, it was still a family residence where, you know, it's not the situation where once you move somewhere, you need to change all of your addresses because you will no longer have any connection to this place. The check was sent to the house. It was dated the day before this search occurred, so it makes sense that the check may have just arrived. It was put away for safekeeping until the future date where Alicea had the opportunity to endorse it, and then Anais could then deposit it for him. As for the renewal of the driver's license, I can think of any number of reasons why he kept that address, the most obvious of which being near convenience. I know when I went, when I renewed my license, there's a couple of ways you can do it, and the easiest way being is they just send you a form in the mail. You fill it out, and you send it right back, and you get a sticker, and you put it on your license without any of the muscle and fuss of going to the DMV and changing it. And like I said, so he said maybe he's moving, he has moved to Morales' home, and we don't know the circumstances of that. He's moving, maybe he moved out of the home because suddenly his sons are living there. It's a little more crowded. He's living with Morales, but we don't know in the future if that's going to be the future permanent home. There's all kinds of reasons that we can think of for why he had not immediately changed his address, none of which changes the fact that he just was not there at the time of the search, and there's nothing to infer that he had knowledge or control of these guns or control of the area from which they were found. They were hidden. There were other people there. The state simply has failed to present any evidence showing his knowledge or his control of these guns. If there are no further questions. The state failed to prove beyond a reasonable doubt that Jesus Alessia constructively possessed the guns and ammunition found in the apartment at 3036 North Knox. Based on the evidence presented by the state, no rational trier of fact could find that Alessia had knowledge of the guns or that he had control over the area where they were found. What should we make of his flight from the police? I think that's understandable as well. It's not the situation where police approach you and you have no idea and you're running because you think you did something wrong. He's already been informed that he's going to be arrested. He just did not want to be arrested. That makes perfect sense to me. For these reasons, we ask that this Court reverse Alessia's convictions. Thank you. May it please the Court. Assistant State's Attorney Andrea Salone for the people. On a challenge to the sufficiency of the evidence, this Court needs only answer whether after reviewing the decision of the trial court in the light most favorable to the people, any rational trier of fact could have found defendant guilty of unlawful possession of a weapon by a felon. On June 2, 2010, the Chicago Police Department executed a valid search warrant of defendants' residence at 3036 North Knox. They entered into their first bedroom apartment and they searched the first of two bedrooms, the first bedroom being with a perfectly made bed, a mattress with a sheet on it, pillows, an armoire, a dresser, a closet full of clothing. And underneath that mattress, they found a gun. Then they searched the dresser drawer. And in the dresser drawer underneath men's clothing, they found a United States Department issued treasury check for a defendant with his name and 3036 North Knox listed as that address and $635 worth of cash with a rubber band around it. And then they searched the armoire full of men's clothing. And underneath that full of men's clothing, they found two additional guns and a crown royal bag full of live ammunition. And then in the closet full of men's clothing underneath more clothing, they found an additional $790 of cash with a rubber band around it. Now, the warrant was executed about 1130 at night, right? Correct. The first thing the police see when they force entry to the apartment is Mr. Blanchard exiting the rear bedroom holding a small child. Correct. Does that give rise to the inference that perhaps he was sleeping back there? Christopher Blanchard, you're absolutely correct, Christopher Blanchard came from bedroom number two, not the bedroom number one where all of the contraband, the weapons, and the ammunition were found. And preceded by some pit bulls. And after securing the pit bulls, Sergeant Winstrom had the opportunity to speak to Christopher who said he was just visiting. And he gave defendant's cell phone number to Sergeant Winstrom who called the defendant immediately and said, I've just executed a search warrant at your residence, 3036 North Knox. You need to return to your residence and turn yourself in. If you need an extra day, you can come and turn yourself in tomorrow if you need to get your affairs in order. My question was, isn't the fact that Christopher Blanchard is exiting the second bedroom at 1130 at night holding a small child a reasonable indication that he was sleeping in that bedroom? Absolutely, it's a reasonable indication that Christopher was sleeping in that second bedroom. But as Sergeant Winstrom testified, he said he was visiting. Well, would it stand to reason, according to the officer, Mr. Blanchard said, I got out of prison recently. And I and my child are visiting the grandfather, meaning the defendant. If the police are executing a search warrant, finding drugs, weapons, and ammunition, would it stand to reason that Mr. Blanchard might try and minimize how long he's been in that apartment, having just gotten out of prison? In other words, he wouldn't want to admit to the police that he had been living there for a year? That's a reasonable inference. However, we're looking at the inferences that the trial court made, and given all of the testimony and all of the evidence that she had in front of her, and we found that all of her, the inferences, rational inferences and credibility determinations that she made, should be upheld because there's nothing so improbable about them as to overturn it. You have testimony from, the only conflicting testimony is from defendant's daughter and his fiancee testifying about how long or the extent to which Christopher lived there. And the trial court made a credibility determination about those two witnesses and found them to be, as she said, absolutely incredible. And that was within her purview to do. And so while we can make a number of inferences that on their own seem to be rational here today, the trial court made her inferences and credibility determinations based on all the testimony and all the evidence she heard and her opportunity to observe these witnesses and assess their demeanor, their tone, and everything else that we don't really have the opportunity to do here today. Well, one of the things that Judge Haberkorn commented on in resolving the issues in the case was that she didn't believe that three adults and sometimes two children could live in this apartment. Looking at the photographs of the apartment. But again, one of the photographs introduced into evidence shows a box spring leaning up against the wall of the back bedroom. You can't tell whether there's a mattress behind there, can you? You can't tell from the photographs and there's no testimony in the record as to whether there was a mattress behind there. Well, one of the detectives or the officers who executed the warrant was asked, was there a bed in the back bedroom? And he said, not a big bed, no. He didn't say there was no bed. Right, he said there was a small bed, yes. And what he also said was, what he testified to was that there was this small bed in there, but he didn't say that there was any clothing in there. He didn't say that there was any furniture that you would have in a typical bedroom. And you can see from the photographs that that room is completely full of children's toys, children's things. It's not a living space. In fact, the only living space is that first bedroom where a defendant's proof of residency was found, all the three guns, the ammunition and the stacks of cash all hidden in what would be an intimate room, one person's intimate space. That's the only place. So after Sergeant Winstrom spoke to Christopher and Christopher said, I'm just here visiting, he gave Sergeant Winstrom his father's phone number, Sergeant called the defendant and said, I've just executed a search warrant at your residence, you need to turn yourself in. And that didn't happen. The defendant didn't turn himself in, he didn't return to his residence that day. He didn't return on the second day. And Officer Vachetto sat outside of that residence and watched as people moved items from that into a moving truck. And then 49 days later, Officer Vachetto saw a defendant leaning against a car, at which time the defendant jumped. In a different neighborhood, not anywhere near. In the surrounding area, saw him leaning against a car, ran him through his personal data terminal, verified that it was defendant and defendant took off running in a car with stolen temporary plates. And then when he jumped out of the car, he physically fled on foot. And as we know from People Vs. Heart, flight is evidence of guilt. So you have not just the flight from not turning yourself in on the day of the search, when you had an opportunity to speak to Sergeant Winstrom and you didn't come and return to the residence. You have people moving out of the house on June 3rd. And then you have 49 days later, a physical flight in a car with stolen temporary plates and then on foot until he was apprehended. Well, how does all that show he had any knowledge that there were guns there? Knowledge, speaking of constructive possession, knowledge is inferred from all of the facts and circumstances surrounding where the contraband is found. So in bedroom number one, you have all of these items hidden underneath. Clothes, Vince clothes. Clothing. Were there any evidence in the trial that it was his clothes? No. Okay. So it was somebody else's clothes. We know that the trial court made rational inference that that whole bedroom was his intimate space based on the proof of residency. How does it, I don't understand how one follows the other. You. How is it possible people live in different places? You could have your mail sent to wherever you want your mail sent. Absolutely. And have your drivers like you mentioned before. So how does that say that he lives in that bedroom when the testimony of his girlfriend and his daughter is contrary to that? Because we have to keep in mind that the trial court found the testimony from the girlfriend that was contrary to it to be absolutely incredible. And so she would. So she thinks that he lives in, you're saying the judge thinks he lives in that bedroom, right? She said she believed that it was his bedroom, that that was his intimate space and all the trial court needed to have to infer knowledge from the control of that bedroom was his proof of residency which was found underneath. And he was hiding, he similarly treated his personal items the same way, whether those are his clothes or not. He's similarly treating his check that had been issued the day before the search, underneath clothing in that dresser, money hidden underneath clothing. But nobody said that he put the money there or he put the check there. There's no testimony. We have testimony from his daughter saying that she lived in that second bedroom and that she put the check on top of the second, the armoire in that second bedroom. But there was no armoire in that second bedroom. In fact, the check was found in the first bedroom. And this kind of goes into why the trial court could find her testimony absolutely incredible and determine that the proof of residency, where it was found, where the police recovered it, in that first bedroom, was in that second bedroom. Because the evidence was rational, rationally his. He had knowledge of, of course, where his money was. We're in the records that show he had knowledge of the money. No, this is the rational inference. But how can you, anybody could have put money there. Everybody in that apartment had access to those drawers. But the trial court made a determination that that bedroom was defendant's intimate space. So if you think about what she did in throwing out the 118 grams of heroin that was found in the kitchen pantry and how that 118 grams of heroin found in the kitchen pantry was determined to have been found in a communal space. If you think about how she meticulously then determined that that's communal space and anybody could have access to that. And then hold that up against her determination that the bedroom was different. It wasn't like the communal kitchen pantry where all this heroin was found. But if I understand the trial court's ruling, it's that she didn't believe that any of these other adults lived in that apartment and that only the defendant lived there. And if that was her conclusion, then the drugs are as much in his constructive possession as the weapons and ammunition. Well, the trial court said, according to the record, that she didn't believe that five people, three adults and sometimes two children, were living there at the same time that the defendant lived there. That they weren't all five living there together. And whether or not they were there, we know that Christopher was there at the time that the warrant was executed. Joint possession doesn't negate exclusive control, people versus givens. It says that you can still have joint possession. They can put their hands on the contraband and that doesn't negate defendant's exclusive control over all of these items. And we know that he had control over that space because his proof of residency was found there. His state ID that he had just updated two months prior had 3036 North Knox listed as his address. And the party stipulated to that. I thought you have to prove beyond reasonable doubt. And we did. Because we have all of the elements met of constructive possession. By the end of the people's case. And the trial court said she made all of these inferences and credibility determinations based on the testimony that she heard. And there is, the defendant would have this court completely overturn any credibility determinations that the trial court made. And that's just not, it's not proper. Okay. So for all of these reasons we ask that you affirm the decision of the trial court. Thank you. Just one quick point. Even if we are going to accept the trial court's credibility determination, I don't think this changes what the state's evidence actually was. We had a driver's license and a check that was hidden, that was put away somewhere where the guns were not used. And there is no way to infer that Alessia had knowledge or control of these items where he was not there and where other people had access. Well, wasn't the credibility had to do with the number of people who lived there? Well, I think there was no doubt that there was, at least Christopher Blanchard, there was no doubt that he was there. Whether he lived there long-term, he was there at the time of the search. And then the pictures also show that a child lives there. There's kids' stuff there. And there's women's items in the bedroom. There's clear evidence that multiple people lived in this room. And there is just simply nothing to connect the defendant to these items that were hidden away and where he was not there at the time of the search. Thank you very much. Appreciate the arguments of counsel. And we take the case under advisement, take a short break, and we'll return.